Filed 11/14/14  P. v. Uy CA3
Opinion following order vacating prior opinion

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | C063037 |
| v. | (Super. Ct. No. SF107288B) |
| RATTANY UY, | |
| Defendant and Appellant. | |
| THE PEOPLE, | |
| Plaintiff and Respondent, | C063481 |
| v. | (Super. Ct. No. SF107288A) |
| CHANREASMEY PRUM, | |
| Defendant and Appellant. | |

1

In separate jury trials, defendants Rattany Uy and Chanreasmey Prum were convicted of first degree murder as active participants in, and for the benefit of, a criminal street gang. They were also convicted of three attempted premeditated murders, shooting at an occupied motor vehicle, carrying a loaded firearm by a gang participant, carrying a concealed firearm by a gang participant, possession of a firearm by a felon (as to Prum only), and active participation in a criminal street gang.

Of relevance to the issues on appeal, the trial court sentenced defendants as follows: Uy to life in prison without the possibility of parole for murder plus a consecutive 10-year prison term on the Penal Code section 186.22 enhancement;[1] and Prum to life in prison without the possibility of parole for murder and three consecutive terms of 15 years to life in prison for attempted murder, plus 10 years (count 4) and additional 15-year-to-life terms (counts 1, 2, 3 and 5) for section 186.22 enhancements.

We consolidated the appeals for argument and decision only. In part I we address Uy's contentions, and in part II we address Prum's contentions.

In his appellant's opening brief, Uy claimed (A) a statement he made to police is inadmissible because it was not voluntary; (B) the trial court erred in giving the jury a "kill zone" instruction because there was no substantial evidence of the creation of a kill zone; (C) the trial court erred in treating life without the possibility of parole (LWOP) as the presumptive penalty for the murder conviction, Uy's LWOP sentence is erroneous because the probation report and the trial court did not consider relevant mitigating factors, and Uy's trial counsel provided ineffective assistance by failing to object to the deficient probation report and failing to argue relevant mitigating factors; and (D) the trial court erred in imposing a 10-year enhancement for benefitting a criminal street gang on the count 1 murder conviction.

---

[1] Undesignated statutory references are to the Penal Code.

In an opinion filed on December 31, 2013, we concluded Uy's contentions lacked merit except for his last contention challenging the 10-year enhancement.  The California Supreme Court granted Uy's petition for review on April 30, 2014, and deferred action in the case pending disposition in *People v. Gutierrez* (Supreme Ct. No. S206365) and *People v. Moffett* (Supreme Ct. No. S206771).[2]  After it filed its opinion in *Gutierrez, supra,* 58 Cal.4th 1354, the Supreme Court transferred this matter to us with directions to vacate our decision and to reconsider the cause in light of *Gutierrez.*  Uy then asked us for permission to file a supplemental brief to address an issue not previously raised on appeal:  that under *People v. Chiu* (2014) 59 Cal.4th 155 (*Chiu*), the trial court erred in instructing the jury that an aider and abettor may be guilty of first degree murder under the natural and probable consequences doctrine.

We vacated our original opinion in compliance with the Supreme Court's order and granted Uy's motion to file a supplemental brief.  We directed the parties to file supplemental briefs addressing the effect on this case of the decision in *Gutierrez, supra,* 58 Cal.4th 1354, and to address the issues identified in Uy's motion regarding *Chiu, supra,* 59 Cal.4th 155.  Uy and the Attorney General submitted supplemental briefs on those issues.

In his supplemental brief, Uy now contends that based on *Gutierrez, supra,* 58 Cal.4th 1354, we must reverse the count 1 LWOP sentence and remand the case for resentencing.  The Attorney General agrees.  Uy also contends that under *Chiu, supra,* 59 Cal.4th 155, we must reverse his count 1 first degree murder conviction because the trial

---

[2]  The Supreme Court consolidated the actions in *People v. Guiterrez* (Supreme Ct. No. S206365) and *People v. Moffett* (Supreme Ct. No. S206771) to determine whether a presumption in favor of a sentence of LWOP under section 190.5, subdivision (b) violates the Eighth Amendment to the federal Constitution under the principles announced in *Miller v. Alabama* (2012) 567 U.S. ___ [183 L.Ed.2d 407] (*Miller*) . (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1360-1361 (*Gutierrez*).)

3

court incorrectly instructed, and the prosecutor improperly argued, that the jury could convict Uy of first degree murder based on the natural and probable consequences doctrine.

We now conclude (A) Uy's statement to police is admissible; (B) substantial evidence supports the "kill zone" jury instruction; (C) we will reverse the LWOP sentence on count 1 and remand the matter for resentencing consistent with *Gutierrez, supra,* 58 Cal.4th 1354 and *Miller, supra,* 567 U.S. ___ [183 L.Ed.2d 407]; (D) because, on remand, Uy will receive a sentence of either 25 years to life or LWOP on the count 1 murder conviction, and because section 186.22, subdivision (b)(1) does not increase the penalty for gang-related felonies punishable by indeterminate sentences, we will modify the judgment by striking the 10-year enhancement on count 1 imposed pursuant to section 186.22, subdivision (b)(1); and (E) any error in instructing with CALCRIM No. 403 regarding the natural and probable consequences doctrine was harmless beyond a reasonable doubt based on jury findings that defendant directly aided and abetted premeditated murder.  Accordingly, we will reverse the count 1 LWOP sentence, strike the 10-year section 186.22, subdivision (b)(1) enhancement on count 1, remand the matter for resentencing, and otherwise affirm the judgment against Uy.

Prum contends (A) the trial court erred in admitting cumulative and irrelevant character evidence; (B) there was insufficient evidence to establish that members of the Bloods street gang engaged in a pattern of criminal gang activity; (C) the trial court erred in instructing the jury with CALCRIM No. 372 [defendant's flight] because there was no evidence supporting an inference of consciousness of guilt; (D) the jury instruction given for attempted murder (former CALCRIM No. 600) did not accurately explain the kill zone theory; (E) there was insufficient evidence that Prum attempted to kill Renee and her daughters; (F) the trial court erred in failing to instruct the jury on the elements for carrying a loaded firearm by a gang participant (count 6) and carrying a concealed

4

firearm by a gang participant (count 7); and (G) the trial court committed various sentencing errors.

Regarding Prum's contentions, we agree that the trial court should have instructed the jury on the elements of carrying a loaded firearm by a gang participant (count 6) and carrying a concealed firearm by a gang participant (count 7), and that the omission requires reversal of those convictions. (*People v. Cummings* (1993) 4 Cal.4th 1233, 1311-1315 (*Cummings*).) We also agree with some of Prum's assertions regarding sentencing error. We will modify the judgment to strike the life sentences imposed pursuant to section 186.22, subdivision (b)(1) on the convictions for counts 1, 2 and 3, to strike the 10-year prison term enhancement on the conviction for count 4, and to reflect that Prum is sentenced on the count 5 conviction to a term of 15 years to life in prison. We will affirm the judgment against Prum as modified.

BACKGROUND

Members of the Bloods street gang consider the area around Louis Park in Stockton to be part of their gang territory. The Original Bloods and the West Side Bloods are subsets of the Bloods gang.

Hostility between members of the Bloods and members of the Norteño street gang erupted during a 2008 New Year's party with an exchange of words and gunfire. Some Bloods believed that John Tellez, Jr. (John Jr.), a Norteño, shot at Bloods at the party. There was another exchange of gunfire on January 25, 2008.

Two weeks later, on February 8, 2008, John Jr. was at Louis Park with family and friends, including his father's girlfriend Renee and her children Aaron, Alana and Marissa. John Jr. wore a red sweater, a red belt with "14" on the belt buckle signifying the letter "N" for Norteño, red and black shoes, and a red and black hat. Red is the color associated with the Norteños. Red is also the color associated with the Bloods.

Renee noticed four men walking toward John Jr. One of the men wore a black hoodie and had a red bandana over his nose and mouth. According to gang expert

5

Detective Paul Gutierrez, gang members often "posse up" and cover their faces with bandanas or "mask up" when they commit a crime.

John Jr. recognized the man with the red bandana as "Beast," someone he knew from the neighborhood as affiliated with West Side Bloods. At trial, Prum admitted he was known as "Beast" and was the man in the red bandana.

Prum pulled his bandana down and spoke to John Jr. in a loud and aggressive voice. He called John Jr. "Little John" and asked "What's up?" and "Where's your friends?" Prum told John Jr. "I got you now, you're slipping"[3] and said that John Jr. was lucky he was with his family otherwise Prum would "blast [John Jr.] right now." Prum called out "West Side Bloods" and his companions yelled West Side Bloods slogans. One of Prum's companions bobbed up and down, made gang hand gestures, and called out "West Side Bloods."

Prum pulled out a MAC-10 type firearm and pointed it at John Jr. Renee ran to get her children.

John Jr. told Prum there were kids around and they would "handle it" another time. According to John Jr. a gang rule dictated that gang members do not handle "business" when family, especially children, were around. Prum told John Jr. and his group to get out of the park. John Jr.'s father said they would leave immediately. Prum and his companions walked away.

John Jr. did not yell anything or challenge anyone as he left, and neither did anyone from his group. Although John Jr. had a loaded nine-millimeter semiautomatic handgun on his person, he did not pull out his gun during the confrontation with Prum.

---

[3] According to Detective Gutierrez, "caught slipping" describes situations where a gang member is vulnerable to attack by rivals, such as where he or she is confronted outside of his or her gang's territory.

John Jr.'s group ran to their cars and left the parking lot quickly. Renee's son Aaron sat in the front passenger seat of Renee's car, while her daughters Alana and Marissa sat in the backseat. Gunfire erupted as the line of cars drove off. John Jr. heard gunshots coming from an area in the park with picnic tables and saw muzzle flashes where he had seen Prum and his companions walking. The shooters aimed at the fleeing cars while running alongside or toward the cars. John Jr.'s father heard close to a dozen gunshots from what sounded like three guns and saw muzzle flashes from inside the park.

After he heard gunshots, John Jr. grabbed his gun and fired 12 or 14 shots at the people in the park. After he fired his gun, John Jr. heard more than 10 shots coming back toward him.

A bullet consistent with a nine-millimeter Luger cartridge pierced the driver-side door of Renee's car. The bullet perforated Aaron's left lung and caused him to bleed to death. A criminalist opined that the bullet that killed Aaron was most likely fired from a nine-millimeter semiautomatic pistol consistent with a MAC-type firearm. Prum did not dispute that his bullet killed Aaron. A bullet also wounded Renee in her left arm.

Ballistics evidence and witness testimony showed that five firearms were used during the February 8 shooting: two nine-millimeter guns, a .45-caliber semiautomatic firearm, and two .38-caliber revolvers.

John Jr. and his father identified Prum from a photographic lineup. John Jr. also told police "Beast" was the person who confronted him at the park. A search of two addresses associated with Prum yielded a red bandana and albums containing photographs of Prum and others displaying gang signs and wearing red clothing. Police did not find a MAC-10 firearm.

Renee told police detectives that "Rattalack" may have been present at the Louis Park shooting. Detective Michael George determined that "Rattalack" was a name associated with Rattany Uy. Detectives interviewed Uy on March 20, 2008. The entire

7

interview was video- and audio-recorded, and a redacted version of the recording was played to the jury at Uy's trial.

Uy told detectives the following: Uy and Prum drove by Louis Park and saw people they believed to be Norteños at the park. Uy and Prum then drove to Doray Court to recruit their "homies." They saw Michael Garduno and Deandre Cole. Prum told Garduno and Cole there were Norteños at the park and to get their guns. Garduno got a nine-millimeter gun. Cole had a revolver. Uy had a .22-caliber gun. Prum procured a nine-millimeter "submachine gun" and changed into a black hoodie. Prum, Uy, Cole and Garduno armed themselves because if the Norteños at the park "trip[ped]" the men would shoot the Norteños. As the men drove to the park they discussed shooting and separating when the shooting began. Prum and Cole said they were going to shoot the Norteños at the park because of the New Year's shooting. Prum walked up to the group in the park and drew his gun. He wore a red bandana around his neck. He was "talkin' up gang signs," called out "West Side Bloods" and said that the Norteños shot at the Bloods on New Year's. Uy, Garduno and Cole stood behind Prum. The other people walked away and Prum started walking back. Cars then began to leave. Uy saw Renee and Aaron get into their car. Prum shot first, aiming at the cars that were leaving, then Garduno and Cole ran up and fired their guns multiple times. Uy ran while shooting. He shot up in the air and did not aim at the cars.

Uy was taken into custody following his March 20 interview. He subsequently admitted to Detective Gutierrez that he stood behind some picnic tables and used a .45-caliber gun during the Louis Park shooting.

Detective Gutierrez testified at Uy and Prum's trials as an expert on Asian criminal street gangs in Stockton. The detective opined that the Bloods and, in particular, West Side Bloods and Original Bloods were criminal street gangs. Bloods have identifiable hand signs and symbols, and Original Bloods and West Side Bloods members committed crimes together. If an individual satisfied two out of nine validation criteria

8

within a five-year period, he or she was considered a documented gang member by the Stockton Police Department. The criteria included self-admission, associating with a documented gang member or documented gang members, participation in a gang-related crime, having "gang indicia," and information from citizen informants that the person was a gang member. According to Detective Gutierrez, Prum was an active participant in the Original Bloods because he associated with other documented members of the gang, had admitted to being a member of the gang, had participated in gang-related crimes with other Original Bloods members, and police found photographs of Prum that contain indicia of gang membership. Prum's moniker was "Beast." He was also known as "Damu" which means blood.

Detective Gutierrez opined that Uy was also an active Original Bloods member. This opinion was based on self-admission and participation in gang-related activities. In addition, police had observed Uy associating with admitted or documented Original Bloods members. The People also presented photographs showing Uy throwing gang signs and wearing apparel with gang indicia.

According to Detective Gutierrez, Cole was a documented Original Bloods member. Detective Gutierrez opined that Garduno did not meet the criteria to be considered an active member of a criminal street gang, but Garduno was a Bloods "associate."

Detective Gutierrez further opined that the Louis Park shooting was gang-related activity. In his view, defendants worked together to commit the Louis Park crimes for the benefit of, at the direction of or in association with a criminal street gang with the specific intent to promote, further or assist in criminal activity by gang members. This opinion was based on the following: the Bloods blamed John Jr. for shooting at them on New Year's; the shooters called out "West Side Bloods" during the confrontation with John Jr.; the shooters and the Bloods gained notoriety in the community because of the shooting; the Louis Park shooting intimidated people in the community; ballistics

9

evidence showed that the same weapon was used at Louis Park and at the prior January 25 shooting; and three documented Original Bloods members participated in the February 8 shooting.

Prum testified at his trial that he shot at John Jr. in self-defense. He provided the following narrative: On February 8, 2008, Prum saw John Jr. at Louis Park when Prum and Uy drove through the park. Prum and John Jr. had previously socialized together, but on that day there were problems between them. Prum believed John Jr. posed a danger to him and the neighborhood based on the New Year's and January 25 shootings. Prum and Uy planned to tell John Jr. to leave the park. Because he believed John Jr. might be armed, Prum asked Uy if Uy had a gun. Uy obtained a .45-caliber gun. Prum told Uy that Prum also needed a gun and they needed "backup." Uy recruited Cole and Garduno. Prum told Cole and Garduno they were going to the park to "punk" John Jr. and kick him out of the park. Cole and Garduno each had a .38-caliber revolver. Prum called a friend for a gun and picked up a MAC-10 for himself 10 to 20 minutes later. Prum made sure the weapon was "fully loaded" in the clip. Defendants then returned to the park. Prum parked on Pixie Drive so that his car would not be detected. He carried the MAC-10 and wore a red bandana over his face to conceal his identity. He walked up to John Jr. and told John Jr. "this [was a] West Side Blood neighborhood" and John Jr. had to leave. John Jr. indicated he would leave. John Jr. did not pull out a gun. Prum saw people running to their cars. Prum and his cohorts then walked back in the direction of his car. When he reached an area where picnic tables were located, Prum heard gunshots from behind him. He ducked down. He saw Garduno and Cole firing towards Monte Diablo Avenue. He also saw muzzle flashes on top of a sportscar on Monte Diablo Avenue. Prum pointed his MAC-10 at the sportscar and fired four to six times. After firing his weapon, Prum ran to his car with Uy, Cole and Garduno following. Prum heard gunshots as he ran to his car. He saw Uy firing his weapon. Prum dropped off Uy, Cole and Garduno at Doray Court and went to a friend's house a few blocks from the park, where

10

he hid for an hour or so.  Thereafter, Prum left for Jackson Rancheria Casino because he "wanted to get away."

In separate jury trials, Prum and Uy were convicted for the first degree murder of Aaron (§ 187, subd. (a) -- count 1); on that count the jury also found true, among other things, that the murder was committed by active participants in a criminal street gang to further the activities of the gang (§ 190.2, subd. (a)(22)) and that the murder was committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)).  In addition, Prum and Uy were convicted on three counts for the attempted premeditated murder of Renee, Alana and Marissa (§§ 187, subd. (a), 664, subd. (a) -- counts 2, 3, 4), shooting at an occupied motor vehicle (§ 246 -- count 5), carrying a loaded firearm by a gang participant (former § 12031, subd. (a)(2)(C), now § 25850, subd. (c)(3) -- count 6),[4] carrying a concealed firearm by a gang participant (former § 12025, subd. (b)(3), now § 25400, subd. (c)(3) -- count 7), possession of a firearm by a felon (former § 12021, now § 29800 [as to Prum only] -- count 8) and active participation in a criminal street gang (§ 186.22, subd. (a)-- count 9).

As relevant to this appeal, for the count 1 murder conviction, the trial court denied Uy's request that he be sentenced to 25 years to life in prison, and instead sentenced Uy to life in prison without the possibility of parole.  The trial court also imposed a consecutive 10-year prison term on count 1 pursuant to the section 186.22, subdivision (b)(1) enhancement.

And as relevant to this appeal, the trial court sentenced Prum to life in prison without the possibility of parole for the count 1 murder conviction; three consecutive

---

[4]  The Legislature reorganized sections 12000 et seq., the deadly weapon statutes. (Stats. 2010, ch. 711, introduction.)  Effective January 1, 2012, the prohibitions contained in sections 12021, 12025 and 12031 are found in sections 29800, 25400 and 25850, respectively.  (Stats. 2010, ch. 711, §§ 4, 6.)  Because the parties refer to the statutes by their former section numbers, we do the same.

terms of 15 years to life for the count 2, 3 and 4 attempted murder convictions; a consecutive five-year term for the count 5 conviction for shooting at an occupied vehicle; and concurrent two-year terms for the convictions on counts 6 [loaded firearm], 8 [felon with firearm] and 9 [gang participation]. The trial court also imposed 25-year-to-life terms for enhancements on counts 1, 2 and 5, which are not challenged in this appeal, plus 10 years for a section 186.22, subdivision (b)(1) enhancement on count 4, and minimum 15-year terms for section 186.22, subdivision (b)(1) enhancements on counts 1, 2, 3 and 5.

## DISCUSSION

### I

### A

Uy claims the statement he made to detectives on March 20, 2008, was involuntary and the trial court erred in denying his motion to suppress the statement.

Uy asserts his statement was involuntary for various reasons.[5] He says Detective Michael George and Detective Crescenciano Villanueva impliedly promised him leniency by assuring him he would not be arrested if he was honest. Uy notes that the detectives did not say until near the end of the interview that the prosecutor would decide whether Uy could go home. Uy also claims Detectives George and Villanueva lied to him. He points to the detectives' assurances that the interview was near its end even though the detectives allegedly had no intention of stopping their questioning.

In addition, Uy claims Detectives George and Villanueva continued to interrogate Uy even after he became ill and emotionally distraught. He further asserts that he was only 17 years old and was small in size compared to the interrogating detectives. And the interrogation continued for over eight hours, albeit with breaks.

_____

[5] Much of Uy's argument in this regard is without citation to the record.

"An involuntary confession may not be introduced into evidence at trial. [Citation.] The prosecution has the burden of establishing by a preponderance of the evidence that a defendant's confession was voluntarily made. [Citations.] In determining whether a confession was voluntary, ' "[t]he question is whether defendant's choice to confess was not 'essentially free' because his [or her] will was overborne." ' [Citation.] Whether the confession was voluntary depends upon the totality of the circumstances. [Citations.]" (*People v. Carrington* (2009) 47 Cal.4th 145, 169.) No single factor is dispositive. (*People v. Williams* (2010) 49 Cal.4th 405, 435-436.) Relevant considerations are " ' "the crucial element of police coercion [citation]; the length of the interrogation [citation]; its location [citation]; its continuity" as well as "the defendant's maturity [citation]; education [citation]; physical condition [citation]; and mental health." ' " (*Id.* at p. 436.) " ' "[T]he courts have prohibited only those psychological ploys which, under all the circumstances, are so coercive that they tend to produce a statement that is both involuntary and unreliable." [Citation.]' " (*Ibid.*)

On appeal, the trial court's factual findings as to the circumstances surrounding a defendant's statement, including the characteristics of the defendant, are upheld if supported by substantial evidence, but the trial court's finding as to the voluntariness of the confession is subject to independent review. (*People v. Carrington, supra,* 47 Cal.4th at p. 169*; People v. Williams*, *supra,* 49 Cal.4th at p. 436.) Whether coercive police activity was present, whether certain conduct constituted a promise and, if so, whether the promise operated as an inducement are also reviewed independently. (*People v. Jones* (1998) 17 Cal.4th 279, 296.)

" ' "Once a suspect has been properly advised of his [or her] rights, he [or she] may be questioned freely so long as the questioner does not threaten harm or falsely promise benefits. Questioning may include exchanges of information, summaries of evidence, outline of theories of events, confrontation with contradictory facts, even debate between police and suspect. . . . Yet in carrying out their interrogations the police

13

must avoid threats of punishment for the suspect's failure to admit or confess particular facts and must avoid false promises of leniency as a reward for admission or confession. . . ." [Citation.]' " (*People v. Carrington, supra,* 47 Cal.4th at p. 170.) A confession is inadmissible if it was elicited by an express or implied promise of benefit or leniency. (*People v. Cahill* (1994) 22 Cal.App.4th 296, 311 (*Cahill*).)

Although Uy contends Detectives George and Villanueva promised not to arrest Uy if he was honest with them, that assertion is not supported by the record.

Detective George accused Uy of lying about never having been in Prum's car, and Uy responded, "If you got somethin' on me that's something I don't know, if you want you can take me to jail . . . ." Detective George said he did not want to take Uy to jail but wanted to find out what happened to Aaron.

Regarding his whereabouts on February 8, Uy admitted being in Prum's car but denied being at Louis Park. He insisted to the detectives that he was being honest with them. Uy then asked:

"[Uy]: Am I goin' to jail?

"[Detective]: What's that?

"[Uy]: Am I goin' to jail?

"[Detective]: I have no intention of puttin' you in jail.

"[Uy]: Oh.

"[Detective]: What we -- what we -- what we need to do is straighten your part out okay? So you guys are at White Lane, he sees your baby, you get in his car, he's gonna go get some beer?

"[Uy]: Yeah."

After giving the detectives more details about what he did with Prum on February 8 and who Prum was with that evening, Uy remained steadfast in denying his involvement in the park shooting. Uy again asked the detectives if they were going to arrest him, and the detectives again responded in the negative.

14

"[Uy]: I'm scared right now.

"[Detective]: Don't be scared, okay.

"((Crosstalk))

"[Detective]: As long as you're honest with us.

"((Crosstalk))

"[Uy]: Am I gettin' locked up if I be honest with you?

"[Detective]: I -- I'm -- I'm gonna tell ya totally honest. My intention right now is not to lock you up.

"[Uy]: Okay.

"[Detective]: But Rattany, 100%, that's not my intention is to lock you up.

"[Detective]: Rattany, you know, it -- it takes a big -- it takes a big man to sit there and tell us the truth.

"((Crosstalk))

"[Uy]: Well, I'm not gonna snitch on anyone now, okay.

"[Detective]: We're not talkin' -- we're not tellin' -- we don't tell people what you've told us.

"[Uy]: Oh, okay.

"[Detective]: Okay, so don't be afraid of them.

"((Crosstalk))

"[Detective]: You know, it's -- it's.

"[Uy]: Cuz I live right there by. [¶] . . . [¶]

"[Detective]: Beast already told us he was in the car with you. I mean he already told us that, that's how we knew that. [¶] . . . [¶]

"[Uy]: But I wasn't over there at the time though. [¶] . . . [¶]

"[Detective]: Let's go get those pictures. Just take a little -- just hang out.

"((Crosstalk))

"[Uy]: Well, am I going to be locked up, man?

15

"[Detective]: Well, we want you to be honest with us okay? Okay we're gonna show you some pictures, be back in a few minutes okay?"

Subsequently, Uy admitted that he and Prum went to Doray Court, near Louis Park, after 5 p.m. on February 8. Uy also identified the gun Prum had on the night of the shooting. However, Uy continued to deny that he was at the park. Detective George urged Uy to tell the truth. Uy then asked:

"[Uy]: Yes. And I'm not gettin' locked up if I tell you?

"[Detective]: I can tell you this Rattany, I need you to be honest.

"[Uy]: Mm-hm.

"[Detective]: Okay?

"[Uy]: Mm-hm.

"[Detective]: You have to be totally honest with us. [¶] . . . [¶] . . . No discrepancies, okay? You can't make nothin' up.

"[Uy]: Uh-uh.

"[Detective]: Here Rat -- Rattany, we don't make promises okay? [¶] . . . [¶] It's from your -- your words to our ears and we go right to the DA and tell them what you -- that you -- 'he's bein' honest now he's tellin' us this. He's bein' truthful.' That's what we're gonna do. [¶] . . . [¶] Okay that's what we're gonna do for you. [¶] . . . [¶] So we can't -- we can't be any more honest than that. That's as honest -- we're tellin' you everything -- the truth. [¶] . . . [¶]

"[Uy]: But you said if I tell you the truth I get to leave right?

"[Detective]: No. I said that you need to tell us the truth. Okay, I said -- I told -- told you my intentions were not to lock you up. [¶] . . . [¶] Okay. Okay. Like my partner said we -- in a case like this -- this -- just like this. [¶] . . . [¶] You're gonna tell us --you're gonna tell us the truth this time around right? [¶] . . . [¶] Okay. Then we're gonna tell the District Attorney. [¶] . . . [¶] What you told us. And then that person will

16

make the decision what happens to you, okay.  Whether you go home tonight or you have to go somewhere else, okay.

"[Detective]:  And we -- we just called Rattany -- we just called the District Attorney so she's on her way over here.  [¶] . . . [¶]  Okay.  But I can't go to her and say, 'Well I think he might say this or I think he might say that.'  She's gonna say, 'What did he tell you?  And he better be tellin' you the truth.'  That's what she's gonna tell me.  [¶] . . . [¶]  So I can't go to her with a lie.

This record indicates that the detectives did not make any promise of leniency. Detective George initially said he did not want to take Uy to jail but wanted to find out what happened to Aaron.  The comment was not a promise of leniency but instead a statement of the detective's intent at that moment in time.  At that point in the interview there was no basis for an arrest because Uy denied being present at the park on the day of the shooting.  In fact, Uy continued to deny he was at the park for another 85 pages of the transcript.  During that portion of the interview, Detective Villanueva also believed Uy had not yet provided information to justify his arrest.  The detective was still hoping that Uy could provide witness information about the shooting.

The detectives subsequently told Uy that they would advise the prosecutor of Uy's truthfulness.  But that was not a promise of leniency.  (*People v. Boyde* (1988) 46 Cal.3d 212, 239 [officer repeatedly told defendant he had no authority to make a promise of leniency, but could only pass information to the district attorney]; *People v. Ramos* (2004) 121 Cal.App.4th 1194, 1203 [officer told defendant he would bring defendant's statements to the district attorney's office for consideration].)  When Uy asked if he was going home that day, Detective George reiterated that he could not make Uy any promises.

The detectives' statements to Uy are in sharp contrast with those made to the defendant in *People v. Vasila* (1995) 38 Cal.App.4th 865 (*Vasila*), cited in Uy's opening brief.  In *Vasila*, investigators told the defendant they would not involve the U.S.

17

Attorney and, therefore, no federal charges would be brought and the defendant would be released from custody that day if he told investigators where certain illegal guns were hidden. (*Id.* at pp. 870, 872, 874) The defendant was released from custody when he revealed the location of the guns. (*Id.* at 872.) The appellate court in *Vasila* held that the investigators promised the defendant some benefit beyond that which ordinarily results from being truthful, and such promises clearly motivated the defendant to lead investigators to the location of the weapons. (*Id.* at pp. 874-877.) Here, however, the detectives did not promise that they would not arrest Uy. In fact, Uy knew he could be arrested if he was one of the shooters.

Uy's reliance on *People v. Johnson* (1969) 70 Cal.2d 469 (*Johnson*) and *Cahill, supra,* 22 Cal.App.4th 296 is also misplaced. In *Johnson* an investigator for the prosecutor told the defendant that his statement was not admissible in court and was merely "an investigative lead, [or] aid," and police officers told the defendant he was charged with first degree murder for which he could get the gas chamber and if he did not offer an explanation for how the victim died the jury might find malice. (*Johnson, supra,* 70 Cal.2d at pp. 474, 475-476, 478, italics omitted.) The California Supreme Court said the statements by the authorities implied that the defendant might avoid a first degree murder conviction by cooperating with the police. (*Id.* at p. 479.) "To someone unskilled and uncounseled in the law it might have offered a hope that since no money was taken in the robbery and if, as [the defendant] claimed he did not do the shooting, that he might be cleared of any serious charges." (*Ibid.*) Coupled with defective *Miranda* warnings and the defendant's youth and lack of criminal history, the Supreme Court concluded the statements by law enforcement officials rendered the defendant's confession involuntary. (*Id.* at pp. 474, 478-479.)

In *Cahill,* the interrogating detectives implied that unless the defendant admitted he was in the victim's house and denied that he premeditated the murder, he would be tried for first degree murder and be eligible for the death penalty. (*Cahill, supra,* 22

18

Cal.App.4th at pp. 314-315.) This implication was reinforced by a materially misleading account of California law. (*Id.* at p. 315.) A detective also made repeated remarks about helping the defendant and there was a suggestion that the detective would testify concerning the defendant's remorse if he confessed. (*Id.* at pp. 314-316.) Based on those circumstances, this court held the detectives' remarks amounted to a promise of leniency or a threat. (*Ibid.*)

But here, Uy does not contend that he was improperly advised of his *Miranda* rights, or that he did not knowingly and intelligently waive those rights. In addition, Detectives George and Villanueva did not tell Uy he would escape prosecution even if he was involved in the shooting. There was no suggestion of a lighter sentence or reduced criminal culpability if Uy talked to the detectives. There was also no misrepresentation concerning California murder law.

As for Uy's contention that he was "unskilled and uncounseled in the law," the claim is forfeited because it was not raised below. (*People v. Williams, supra,* 49 Cal.4th at p. 435 [elements of a voluntariness claim that were not raised at trial are forfeited].) Uy's contention that he was small in size compared to the interrogating detectives -- implying that the detectives' size had a coercive effect -- was also not raised at trial and is likewise forfeited. In any event, the record does not support either factual claim. Although Uy was only 17 at the time of the interview, he was familiar with the juvenile justice system. Uy had been a gang member since he was nine or 10 years old and he was experienced enough to demand that his *Miranda* rights be read to him. And nothing in the record shows that Detective George or Detective Villanueva used their size to intimidate Uy during the March 20 interview.[6]

---

[6] We granted the Attorney General's application to transmit People's exhibit No. 186 to this court, and we reviewed the video recording of Uy's interrogation.

19

Uy further asserts that his March 20 statement was involuntary because Detectives George and Villanueva lied to him, but the assertion lacks merit.

"Deception does not undermine the voluntariness of a defendant's statements to the authorities unless the deception is ' " 'of a type reasonably likely to procure an untrue statement.' " ' [Citations.]" (*People v. Williams, supra,* 49 Cal.4th at p. 443.) " 'Police officers are . . . at liberty to utilize deceptive stratagems to trick a guilty person into confessing.' " (*People v. Mays* (2009) 174 Cal.App.4th 156, 165.) For example, in *People v. Thompson* (1990) 50 Cal.3d 134, 167, the California Supreme Court held that interrogating officers' false statements to the defendant that police found physical evidence linking him to the victim's death did not render the defendant's confession involuntary. (*Id.* at pp. 167, 170.)

Detective George and Detective Villanueva did make false statements to Uy during the March 20 interrogation. They told Uy witnesses saw him at Louis Park; that Prum confessed about what he did and told police Uy was with him; that there was a surveillance videotape from T and M Market showing Uy in Prum's car; that police knew Uy did not do anything; that the detectives would not tell anyone what Uy told them; that more than one car was hit by bullets; and that the interrogation was almost over. But there is no evidence that those statements by the detectives prompted Uy to make a *false* statement, especially when Uy already admitted being in Prum's car and continued to deny being at Louis Park for a considerable period of time. Our review of the record indicates that none of the detectives' false statements caused Uy to admit that he was in Prum's car on the day of the shooting, that he stood behind Prum during the confrontation with John Jr., or that he had a gun and fired it. Instead, Uy made self-incriminating statements in response to the detectives' requests that Uy tell the truth, their suggested possible explanations for what happened, their statements that Uy's story was improbable, and their suggestion that if Uy shot a .22-caliber gun, as Uy claimed, it was not his gun that killed Aaron. (*People v. Williams, supra,* 49 Cal.4th at p. 444 [absent

20

improper threats or promises, law enforcement officers may suggest possible explanations of the events, offer defendant an opportunity to provide the details of the crime, and urge the defendant to tell the truth].)  On this record, the trial court did not err in finding no coercive police activity.

Uy also claims that his will was overborne because Detective George and Detective Villanueva continued to question him after he became ill.  The trial court reviewed the videotape of Uy's March 20 statement and found that Uy was ill as a result of stress but that the detectives did not exploit Uy's illness.  Instead, the trial court found that the detectives were concerned about Uy, bringing him food and drinks and giving him breaks.  The trial court noted that later in the interview Uy appeared composed and calm and directly answered the detectives' questions.  The record supports the trial court's findings.

Uy further contends that his March 20 statement was involuntary because Detective George and Detective Villanueva interrogated him for over eight hours.

"A police interrogation that is prolonged may be coercive under some circumstances." (*People v. Carrington, supra,* 47 Cal.4th at p. 175.)  Here, although the interrogation lasted eight hours, police brought Uy water, soda and food.  They repeatedly offered to bring Uy more water, asked if he needed to use the restroom, took him to the restroom when he asked, and took multiple breaks during the eight-hour period.  Under the circumstances the length of the interrogation did not render Uy's March 20 statement involuntary.

Based on the totality of the circumstances, Uy's March 20, 2008, statement to police was not the product of police coercion, and the trial court correctly allowed its introduction into evidence at the trial.

B

Uy contends the trial court committed reversible error in giving a kill zone instruction in connection with the attempted murder counts (counts 2, 3 and 4) because

21

there was insufficient evidence to establish the creation of a kill zone. He asserts that the shots from defendants' guns were fired from hundreds of feet away, only one bullet struck one car out of many in the caravan leaving the park, and there was no evidence that John Jr.'s death was intended to be achieved by killing everyone in the cars fleeing the park. He also claims the prosecutor conceded during closing argument that no one intended to kill any person in Renee's car.

To be guilty of attempted murder, the defendant must intend to kill the alleged victim, not someone else. (*People v. Bland* (2002) 28 Cal.4th 313, 328 (*Bland*); *People v. Smith* (2005) 37 Cal.4th 733, 739, 743 (*Smith*).) Such intent may be inferred where the defendant uses lethal force calculated to kill any person within an area around the primary target (a kill zone) as a means of ensuring the primary target's death, or where the defendant intentionally creates a kill zone "despite the recognition, or with acceptance of the fact, that a natural and probable consequence of that act would be that anyone within that zone could or would die." (*People v. Adams* (2008) 169 Cal.App.4th 1009, 1021-1023.) In such circumstances, the defendant's intent to kill the primary target is concurrent with the intent to kill those within the kill zone. (*Id.* at p. 1021.) " 'For example, an assailant who places a bomb on a commercial airplane intending to harm a primary target on board ensures by this method of attack that all passengers will be killed. Similarly, consider a defendant who intends to kill A and, in order to ensure A's death, drives by a group consisting of A, B, and C, and attacks the group with automatic weapon fire or an explosive device devastating enough to kill everyone in the group. The defendant has intentionally created a "kill zone" to ensure the death of his primary victim, and the trier of fact may reasonably infer from the method employed an intent to kill others concurrent with the intent to kill the primary victim. When the defendant escalated his mode of attack from a single bullet aimed at A's head to a hail of bullets or an explosive device, the factfinder can infer that, whether or not the defendant succeeded in killing A, the defendant concurrently intended to kill everyone in A's immediate

22

vicinity to ensure A's death. . . . Where the means employed to commit the crime against a primary victim create a zone of harm around that victim, the factfinder can reasonably infer that the defendant intended that harm to all who are in the anticipated zone.'. . . [Citation.]" (*Bland, supra,* 28 Cal.4th at pp. 329-330.)

In reviewing Uy's claim that there is insufficient evidence of a kill zone, we must view the evidence in the light most favorable to the judgment and presume in support of the judgment the existence of every fact the jury could reasonably deduce from the evidence. (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206 (*Ochoa*).) We conclude the jury could reasonably find the creation of a kill zone around John Jr. and that Renee and her daughters were within the kill zone.

At the park, Prum drew his gun on John Jr. Prum "talk[ed] up gang signs," called out "West Side Bloods," and talked about Norteños shooting at Bloods on New Year's. Uy saw Renee and Aaron get into their car. Renee's car, which was in front of the car in which John Jr. was a passenger, was similar in appearance and traveling close to John Jr.'s car. Gunfire erupted soon after John Jr. got into his car.

Prum and Uy had semiautomatic firearms. Prum shot at the departing cars first. Uy shot five or six times at the cars. The jury obviously did not believe Uy's statement that he did not aim at the fleeing cars; it found Uy guilty on all counts. We do not disturb the jury's determinations concerning witness credibility. (*Ochoa, supra,* 6 Cal.4th at p. 1206.) Moreover, Garduno fired 8 shots and Cole emptied his revolver. Altogether, defendants fired more than a dozen gunshots toward the fleeing cars. Additionally, witnesses saw the shooters running toward or alongside the departing cars while shooting, aiming at the cars as they went by.

Substantial evidence supports the jury's finding, beyond a reasonable doubt, that Uy intended to kill everyone within the kill zone created by his gunfire, including Renee and her daughters. Accordingly, the trial court did not err by giving the kill zone instruction. The fact that only one bullet hit one car leaving the park does not negate

23

Uy's intent to kill. (*Smith, supra,* 37 Cal.4th at p. 742 [fact that bullet missed its mark does not show lack of intent to kill]; *People v. Chinchilla* (1997) 52 Cal.App.4th 683, 690 [fact that victim escaped death because of shooter's poor marksmanship does not necessarily establish a less culpable state of mind].) *People v. Pham* (2011) 192 Cal.App.4th 552, 559, cited in Uy's reply brief, does not help Uy because it is not a kill zone case.

Uy claims the prosecutor conceded that Uy did not intend to kill the people in Renee's car. Not so. In the context of discussing the doctrine of transferred intent, the prosecutor said she did not believe Uy intended to kill Aaron, but that Uy was still culpable for shooting at the car. Under the doctrine of transferred intent, a person who intends to kill is guilty of the murder of all individuals actually killed even if those people were not the intended target. (*Bland, supra,* 28 Cal.4th at pp. 321-324.) The doctrine of transferred intent applies to count 1, the murder of Aaron. The prosecutor's comment did not concede any point concerning the charges for attempted murder because the doctrine of transferred intent does not apply to attempted murder. (*Id.* at pp. 327-328.)

Uy's claim of instructional error lacks merit.

## C

In his appellant's opening brief, Uy next argued that the count 1 LWOP sentence should be reversed because (1) the trial court erred in treating LWOP as the presumptive penalty for the murder conviction under section 190.5, subdivision (b), (2) Uy's LWOP sentence is erroneous because the probation report and the trial court did not consider relevant mitigating factors, and (3) Uy's trial counsel provided ineffective assistance by failing to object to the deficient probation report and failing to argue relevant mitigating factors. In his supplemental brief following transfer from the California Supreme Court, he now argues that based on *Gutierrez, supra,* 58 Cal.4th 1354, we must reverse the count 1 LWOP sentence and remand the case for resentencing. The Attorney General agrees that we must remand for resentencing, and we do too.

24

Section 190.5, subdivision (b) provides that when a defendant at least 16 years old but less than 18 years old is found guilty of murder in the first degree with one or more special circumstances, the penalty "shall be confinement in the state prison for life without the possibility of parole or, at the discretion of the court, 25 years to life." (§ 190.5, subd. (b).)  In *Gutierrez, supra,* 58 Cal.4th 1354, the California Supreme Court held that a trial court has discretion to impose a sentence of LWOP or 25 years to life under section 190.5, subdivision (b), and there is no presumption in favor of LWOP. (*Gutierrez, supra,* 58 Cal.4th at pp. 1360, 1387.)  In so holding, the Supreme Court disapproved *People v. Guinn* (1994) 28 Cal.App.4th 1130 (*Guinn),* and its progeny, which had previously imposed a presumption in favor of LWOP.  (*Gutierrez, supra,* 58 Cal.4th at pp. 1369-1372, 1387.)  In addition, the Supreme Court said *Miller, supra,* 567 U.S. ___ [183 L.Ed.2d 407], "requires a trial court, in exercising its sentencing discretion, to consider the 'distinctive attributes of youth' and how those attributes 'diminish the penological justifications for imposing the harshest sentences on juvenile offenders' before imposing life without parole on a juvenile offender." (*Gutierrez, supra,* 58 Cal.4th at p. 1361.)  A sentencing court must consider the aggravating and mitigating factors enumerated in section 190.3 and the California Rules of Court.  (*Id.* at p. 1387.) Under *Miller*, a sentencing court must consider (1) the defendant's age and the " 'hallmark features' " of youth, i.e., immaturity, impetuosity, and failure to appreciate risks and consequences; (2) relevant " 'environmental vulnerabilities' " such as childhood abuse or neglect, familial drug or alcohol abuse, lack of adequate parenting or education, prior exposure to violence, and susceptibility to psychological damage or emotional disturbance; (3) the circumstances of the present offense, including the extent of the defendant's participation in the offense, the way familial and peer pressures may have affected the defendant, and whether substance abuse played a role in the defendant's commission of the offense; (4) whether the defendant " 'might have been charged and convicted of a lesser offense if not for incompetencies associated with youth -- for

25

example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys' "; and (5) any evidence or other information bearing on the possibility of rehabilitation, including the extent or absence of a prior criminal record. (*Gutierrez, supra,* 58 Cal.4th at pp. 1388-1389.) The trial court in Gutierrez's case understood it had a degree of discretion in sentencing him, and it did not reference an LWOP presumption in sentencing him under section 190.5, subdivision (b). (*Gutierrez, supra,* 58 Cal.4th at pp. 1367, 1390.) Nonetheless, the Supreme Court held that absent evidence to the contrary, appellate courts presume trial courts have applied the governing law, which in that context included the LWOP presumption expressed in *Guinn, supra,* 28 Cal.App.4th 1130. (*Gutierrez, supra,* 58 Cal.4th at pp. 1390-1391.) Accordingly, the Supreme Court remanded for resentencing.

Here, like in *Gutierrez*, although the trial court understood that it had sentencing discretion and did not reference a presumption in favor of LWOP, it nonetheless made its sentencing decision at a time when the governing law included the *Guinn* LWOP presumption. As the California Supreme Court explained in *Gutierrez*, absent evidence to the contrary, we must presume the trial court applied that governing law. Because there is no evidence in the record to the contrary, we will remand for resentencing consistent with the holdings in *Miller* and *Gutierrez*.

In his appellant's opening brief, Uy also argued that his LWOP sentence was error because the probation report and the trial court did not consider relevant mitigating factors, and Uy's trial counsel provided ineffective assistance by failing to object to the deficient probation report and failing to argue relevant mitigating factors. Because we are remanding for resentencing, we need not decide those claims.

D

On the count 1 murder conviction, the trial court also imposed sentence for various enhancements, including a 10-year consecutive term pursuant to section 186.22,

26

subdivision (b)(1) [felony committed for the benefit of a street gang]. Uy contends it was error to impose the 10-year enhancement term, and we agree.

The criminal street gang sentence enhancement set forth in section 186.22, subdivision (b)(1) increases the penalties for underlying crimes when those crimes are punishable by a *determinate* term. (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 327 (*Sengpadychith*); *People v. Fiu* (2008) 165 Cal.App.4th 360, 390.) But where the underlying felony offense is punishable by an *indeterminate* term, section 186.22, subdivision (b)(1) does not alter or enhance the indeterminate term. (*Sengpadychith, supra,* 26 Cal.4th at p. 327.)

In *People v. Lopez* (2005) 34 Cal.4th 1002 (*Lopez*), the issue was whether a first degree murder committed for the benefit of a gang was subject to the 10-year enhancement in section 186.22, subdivision (b)(1)(C), or whether the murder was governed instead by the 15-year minimum parole eligibility term in section 186.22, subdivision (b)(5). (*Lopez, supra,* 34 Cal.4th at p. 1006.) The California Supreme Court said it appeared that the Legislature "intended section 186.22[, subdivision] (b)(5) to encompass both a straight life term as well [as] a term expressed as years to life (other than those enumerated in subdivision (b)(4)) and therefore intended to exempt those crimes from the 10-year enhancement in subdivision (b)(1)(C)." (*Lopez, supra,* 34 Cal.4th at p. 1007.)

On remand, the trial court will impose a sentence of LWOP or 25 years to life in prison on count 1 because Uy was 17 years old at the time of the offense and he was convicted of special circumstance murder. (§ 190.5, subd. (b).) Section 186.22, subdivision (b)(1) does not apply regardless of which sentence the trial court imposes under section 190.5, subdivision (b). (*Lopez, supra,* 34 Cal.4th at p. 1007.) The *Lopez* decision is not directly on point if the trial court reimposes a sentence of LWOP because *Lopez* did not involve an LWOP sentence. In addition, there is language in *Lopez* indicating that the predecessor to section 186.22, subdivision (b)(5) was understood to

27

apply to all lifers except those sentenced to LWOP.  (*Lopez, supra,* 34 Cal.4th at p. 1010.)  Nonetheless, we conclude the reasoning in *Lopez* is persuasive in this case.

Section 186.22, subdivision (b)(5) applies to "any person who violates this subdivision in the commission of a felony punishable by imprisonment in the state prison for life . . . ."  (§ 186.22, subd. (b)(5).)  Uy fits that description whether he is sentenced to LWOP or to 25 years to life in prison.  Moreover, it is not an anomaly that subdivision (b)(5)'s minimum 15-year parole eligibility provision will have no practical effect in connection with either sentence under section 190.5, subdivision (b).  As the California Supreme Court explained in *Lopez*, the statutory scheme allows for the imposition of greater punishment than that set forth in section 186.22, subdivision (b)(5).  (*Lopez, supra,* 34 Cal.4th at p. 1009.)

We will modify the judgment by striking the 10-year gang enhancement on the count 1 murder conviction.  Under the circumstances, we need not discuss Uy's further contention that the enhancement violates section 654.

E

Citing *Chiu, supra,* 59 Cal.4th 155, Uy contends we must reverse his count 1 first degree murder conviction because the trial court incorrectly instructed, and the prosecutor improperly argued, that the jury could convict Uy of first degree murder based on the natural and probable consequences doctrine.

Uy was prosecuted for Aaron's murder as an aider and abettor.  "There are two distinct forms of culpability for aiders and abettors.  'First, an aider and abettor with the necessary mental state is guilty of the intended crime.  Second, under the natural and probable consequences doctrine, an aider and abettor is guilty not only of the intended crime, but also "for any other offense that was a 'natural and probable consequence' of the crime aided and abetted." ' "  (*Chiu, supra,* 59 Cal.4th at p. 158.)

In *Chiu*, the California Supreme Court held that a defendant cannot be convicted of first degree premeditated murder under the natural and probable consequences

28

doctrine. (*Chiu, supra,* 59 Cal.4th at pp. 158-159.) The Supreme Court said the public policy supporting the natural and probable consequences doctrine "loses its force in the context of a defendant's liability as an aider and abettor of a first degree premeditated murder." (*Id.* at p. 166.) The Court explained that the mental state for first degree murder is uniquely subjective and personal, and the connection between the defendant's culpability and the perpetrator's premeditative state is too attenuated. (*Ibid.*)

Nonetheless, the Supreme Court in *Chiu* held that aiders and abettors "may still be convicted of first degree premeditated murder based on direct aiding and abetting principles." (*Chiu, supra,* 59 Cal.4th at p. 166.) "[T]he prosecution must show that the defendant aided or encouraged the commission of the murder with knowledge of the unlawful purpose of the perpetrator and with the intent or purpose of committing, encouraging, or facilitating its commission." (*Id.* at p. 167.) "An aider and abettor who knowingly and intentionally assists a confederate to kill someone could be found to have acted willfully, deliberately, and with premeditation, having formed his own culpable intent. Such an aider and abettor, then, acts with the mens rea required for first degree murder." (*Ibid.*)

Here, in connection with the count 1 charge of first degree murder, the trial court instructed the jury on the natural and probable consequences doctrine pursuant to CALCRIM No. 403.[7] That instruction is incorrect under *Chiu*. (*Chiu, supra,* 59 Cal.4th

---

[7]    The trial court instructed:  "Before you decide whether the defendant is guilty of murder, . . . [¶] . . . the People must prove that: [¶] 1. The defendant is guilty of shooting at an occupied motor vehicle or assault with a deadly weapon; [¶] 2. During the commission of shooting at an occupied motor vehicle or assault with a deadly weapon, a coparticipant in that crime committed the crime of murder; [¶] AND [¶] 3. Under all of the circumstances, a reasonable person in the defendant's position would have known that the commission of the murder was a natural and probable consequence of the commission of the shooting at an occupied motor vehicle or assault with a deadly weapon.  [¶]  A coparticipant in a crime is the perpetrator or anyone who aided and abetted the perpetrator.  It does not include a victim or innocent bystander.  [¶]  A natural

29

at pp. 158-159.) But any error in instructing with CALCRIM No. 403 was harmless beyond a reasonable doubt based on jury findings that defendant directly aided and abetted premeditated murder.

"When a trial court instructs a jury on two theories of guilt, one of which was legally correct and one legally incorrect, reversal is required unless there is a basis in the record to find that the verdict was based on a valid ground. [Citations.] Defendant's first degree murder conviction must be reversed unless we conclude beyond a reasonable doubt that the jury based its verdict on the legally valid theory that defendant directly aided and abetted the premeditated murder." (*Chiu, supra,* 59 Cal.4th at p. 167.) Instructional error is harmless if other aspects of the verdict or the evidence leave no reasonable doubt the jury made the findings necessary for the legally correct theory. (*People v. Chun* (2009) 45 Cal.4th 1172, 1205; *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1165 [error here is harmless beyond a reasonable doubt if the jury necessarily resolved the issues against the defendant under the other instructions given].)

A person directly aids and abets the commission of a crime when (a) the direct perpetrator commits a crime, (b) the aider and abettor knew of the direct perpetrator's criminal purpose, (c) the aider and abettor intended to commit, encourage or facilitate the

---

and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence. If the murder was committed for a reason independent of the common plan to commit the shooting at an occupied motor vehicle or assault with a deadly weapon, then the commission of murder was not a natural and probable consequence of shooting at an occupied motor vehicle or assault with a deadly weapon. [¶] To decide whether crime of murder was committed, please refer to the separate instructions that I give you on that crime. [¶] The People are alleging that the defendant originally intended to aid and abet either shooting at an occupied motor vehicle or assault with a deadly weapon. [¶] The defendant is guilty of murder if you decide that the defendant aided and abetted one of these crimes and that murder was the natural and probable result of one of these crimes. However, you do not need to agree about which of these two crimes the defendant aided and abetted."

30

perpetrator's commission of the crime, and (d) the aider and abettor's conduct in fact assisted in the commission of the crime. (*People v. Perez* (2005) 35 Cal.4th 1219, 1225; *People v. McCoy* (2001) 25 Cal.4th 1111, 1117; *People v. Beeman* (1984) 35 Cal.3d 547, 561.)

The trial court instructed the jury, pursuant to CALCRIM No. 401, on the required findings for aiding and abetting an intended crime. It told the jury, "To prove that the defendant is guilty of a crime based on aiding and abetting that crime, the People must prove that: [¶] 1. The perpetrator committed the crime; [¶] 2. The defendant knew that the perpetrator intended to commit the crime; [¶] 3. Before or during the commission of the crime, the defendant intended to aid and abet the perpetrator in committing the crime; [¶] AND [¶] 4. The defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime. [¶] Someone aids and abets a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime." The prosecutor argued Uy knowingly helped Prum commit murder, and Uy took an active role in committing that crime. The prosecutor said Uy and his codefendants "intended to shoot into those cars for the purpose of killing the person in that car." The prosecutor argued and the trial court instructed the jury that if Uy intended to kill one person, but by mistake or accident killed someone else instead, then the crime, if any, is the same as if the intended person had been killed.

While the trial court incorrectly instructed the jury with CALCRIM No. 403 (regarding the natural and probable consequences doctrine) on count 1, other portions of the jury instructions and verdict leave no reasonable doubt that the jury made the requisite findings for the legally correct theory that defendant directly aided and abetted premeditated murder. After instructing the jury on the required findings for the count 1 charge of murder, the trial court instructed the jury, pursuant to CALCRIM No. 521 as modified: "If you decide that the defendant has committed murder, you must decide

31

whether it is murder of the first or second degree." The prosecutor similarly said in summation, "when you find him guilty of murder -- because that's what he's guilty of --you then go on and you decide that it was willful, deliberate, and with premeditation . . . ." With regard to the degree of murder, the trial court instructed, "The defendant is guilty of first degree murder if the People have proved that he acted willfully, deliberately, and with premeditation. The defendant acted willfully if he intended to kill. The defendant acted deliberately if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill. The defendant acted with premeditation if he decided to kill before committing the act that caused death. [¶] . . . [¶] All other murders are of the second degree. [¶] The People have the burden of proving beyond a reasonable doubt that the killing was first degree murder rather than a lesser crime. [¶] If the People have not met this burden, you must find the defendant not guilty of first degree murder." The prosecutor argued Uy acted willfully, deliberately, and with premeditation in committing murder.

With regard to the section 190.2, subdivision (a)(22) (active gang participant) special circumstance in count 1, the trial court instructed the jury, pursuant to CALCRIM No. 736, that the People must prove Uy intentionally killed Aaron. The CALCRIM Nos. 521 and 736 instructions given, unlike the CALCRIM No. 403 instruction, required the jury to find Uy (not a coparticipant) acted with intent to kill.

Thus, as instructed, the jury could not convict Uy of first degree murder unless it found Uy personally acted willfully, deliberately, and with premeditation, and the jury could not find true the section 190.2, subdivision (a)(22) special circumstance that active participants in a criminal street gang committed Aaron's murder to further the activities of the gang unless the jury found Uy acted intentionally. The jury found Uy guilty of murder and determined that the murder was in the first degree. The jury further found to be true the section 190.2, subdivision (a)(22) special circumstance on count 1. The record in this case does not disclose jury questions indicating the verdict of first degree

32

premeditated murder may have been based on the natural and probable consequences theory. (Contrast *Chiu, supra,* 59 Cal.4th at pp. 167-168.)

The jury's count 1 verdict necessarily included the finding that Uy acted with the requisite mens rea for first degree murder. (*Chiu, supra,* 59 Cal.4th at p. 166 [first degree murder requires a showing that the defendant acted willfully, deliberately, and with premeditation].) Accordingly, any error in instructing with CALCRIM No. 403 on count 1 was harmless beyond a reasonable doubt.

## II

## A

Prum contends the trial court erred in admitting cumulative and irrelevant character evidence. He argues reversal is required because the admission of gang evidence was prejudicial error under state law and the admission of bad character evidence deprived him of his constitutional right to due process under federal law. He adds that even if we conclude that he forfeited his contention by failing to object in the trial court, we should reach the merits because his trial counsel was ineffective.

We conclude Prum forfeited his claims of error because he failed to object to the admission of gang evidence at trial on any of the grounds asserted on appeal. (*People v. Partida* (2005) 37 Cal.4th 428, 431; *People v. Williams* (1997) 16 Cal.4th 153, 250; Evid. Code, § 353, subd. (a).) Nonetheless, because Prum also asserts ineffective assistance of counsel, we will address his claims on the merits.

## 1

Prum claims the gang evidence was not necessary to prove the gang allegations and substantive gang charge. He asserts that he "essentially conceded" the gang allegations. He says his only argument was that John Jr. fired the first shot.

The record does not support Prum's contention that the gang charge and allegations were conceded. Prum pleaded not guilty to all counts and denied all allegations in the information against him. The record does not disclose a stipulation

33

concerning the gang charge or gang allegations. The prosecution had to prove the gang offense and allegations. Our review of the record disclosed no admission by Prum that the Bloods, Original Bloods or West Side Bloods were criminal street gangs within the meaning of section 186.22, that Prum's involvement in the Original Bloods or West Side Bloods was more than nominal or passive, or that Prum's conduct on February 8 was carried out to further the activities of a gang or to benefit a criminal street gang.

Prum claims his trial counsel explained to the jury that 99 percent of the facts in the case were uncontested. However, the portion of the record Prum cites in support of this claim does not show that Prum conceded the gang offense and/or the gang allegations. Instead, the attorney's comment pertained to the contention that John Jr. had reasons to shoot first.

2

Prum claims the following evidence bears no relevance to the prosecution's case: 23 photographs identified as People's exhibit Nos. 118, 121-126, 153, 232-238 and 239-246, Prum's police contacts, Detective Gutierrez's testimony about possession of firearms and criminal activities by gang members, and Prum's monikers.

"[A]s [a] general rule, [gang evidence] is admissible if it is logically relevant to some material issue in the case, other than character evidence, is not more prejudicial than probative and is not cumulative." (*People v. Albarran* (2007) 149 Cal.App.4th 214, 223.) Gang evidence, i.e., evidence of the defendant's gang affiliation and activity and the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, and rivalries, may be relevant to establish identity, motive, modus operandi, specific intent, means of applying force or fear, witness credibility, or other issues pertinent to guilt of the charged crime. (*Id.* at pp. 223-224; *People v. Samaniego, supra,* 172 Cal.App.4th at pp. 1167-1168 ["Gang evidence is relevant and admissible when the very reason for the underlying crime, that is the motive, is gang related"].) We

34

review the trial court's ruling on the relevance of evidence for abuse of discretion. (*Albarran, supra,* 149 Cal.App.4th at pp. 224-225.)

The photographs were probative of the identity and gang affiliation of Garduno and Uy, the presence of Original Bloods and West Side Bloods in the Louis Park area, the symbols and signs associated with those gangs, Prum's association with documented West Side Bloods and Original Bloods members and a person featured on a Bloods MySpace page, and the fact that Bloods "mask up" by wearing red bandanas over their face as Prum did on February 8 and display gang affiliation by wearing particular apparel.

In addition, the evidence of police contacts was probative of the following: the existence of a criminal street gang, Prum's gang membership and active participation in the Original Bloods and West Side Bloods, the territory for the Original Bloods and West Side Bloods, and that 2845 Pixie Court A was an address associated with Prum.

Prum tried to show that the police did not know whether Prum stayed at 2845 Pixie Court A, the address where police conducted a search and found a red bandana, firearms and paycheck stubs for Prum. On redirect examination, Detective Gutierrez testified about police contacts with Prum at Pixie Court A. That testimony was relevant to show a connection between Prum and the residence on Pixie Court A. It was also relevant to connect Prum with the items found in the search.

Prum objects on relevance grounds to Detective Gutierrez's testimony that it was common for gang members to carry firearms and that Detective Gutierrez had found a large number of firearms in the possession of gang members. But Detective Gutierrez's testimony was relevant to whether the commission of specified criminal acts were primary activities of the Original Bloods and the West Side Bloods and whether members of the Original Bloods and West Side Bloods engaged in a pattern of criminal activity. The testimony was also relevant to Prum's active participation in a gang and his acquisition of a firearm on February 8.

35

Prum's trial counsel asked Detective Gutierrez: "Isn't [a gang] a huge social network?" Prum claims Detective Gutierrez's response to that question is not relevant to the gang offense and allegations. During cross-examination, Detective Gutierrez denied that gangs had a "large social component" and described gang criminal activities without objection from Prum. When defense counsel asked whether certain photographs showed people "just kind of goofing," Detective Gutierrez stated, "I wouldn't call it goofing, I'd call it more getting together to [¶] . . . [¶] conduct business, to have a meeting on what's going on, who they're having issues with. That's what gangsters do, they have gangster meetings." Detective Gutierrez's testimony was directly relevant to gang organization and whether the Original Bloods and West Side Bloods had as one of their primary activities the commission of enumerated criminal acts, which are requisite elements of a criminal street gang.[8] (§ 186.22, subd. (f).)

Prum also states that his monikers "Beast" and "Damu" are not relevant to prove the primary activities of a criminal street gang or a pattern of criminal activity. But Prum's monikers were probative of Prum's identity because some witnesses referred to Prum by his moniker and one of the "kites"[9] Prum wrote to John Jr. referred to the name "Beast." Prum testified he sometimes identified himself as "Beast" and sometimes as "Damu." The moniker "Damu" also had a tendency in reason to prove Prum's gang membership because the word "Damu" means blood.

---

[8] Prum says Detective Gutierrez testified that gangs are violent all the time, but the detective did not identify a single violent offense committed by Bloods. Prum's objection goes to the weight of the evidence, not its admissibility.

[9] Kites are written messages that prisoners send to each other while in custody. While they were at county jail, Prum sent John Jr. 12 or 13 kites.

Prum claims the challenged gang evidence was unduly prejudicial.

The trial court may, in its discretion, exclude evidence if its probative value is substantially outweighed by the probability that its admission will create substantial danger of undue prejudice.  (Evid. Code, § 352.)  The term "undue prejudice" in Evidence Code section 352 refers to evidence which has very little evidentiary impact and " ' "which uniquely tends to evoke an emotional bias against the defendant . . ." ' not the prejudice 'that naturally flows from relevant, highly probative evidence.' "  (*People v. Padilla* (1995) 11 Cal.4th 891, 925, overruled on other grounds in *People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1.)  " ' "[A]ll evidence which tends to prove guilt is prejudicial or damaging to the defendant's case.  The stronger the evidence, the more it is 'prejudicial.' " ' "  (*People v. Poplar* (1999) 70 Cal.App.4th 1129, 1138.)  But Evidence Code section 352 does not make evidence inadmissible merely because it is highly damaging to the defendant.  (*People v. Olguin* (1994) 31 Cal.App.4th 1355, 1373.)  We review the trial court's ruling that gang evidence is not unduly prejudicial for abuse of discretion.  (*People v. Albarran, supra,* 149 Cal.App.4th at pp. 224-225.)

As we have explained, the gang evidence was directly relevant to issues before the jury.  We also conclude the evidence was not unduly prejudicial.  The gang evidence was not more inflammatory than the testimony about the fatal Louis Park shooting.  Prum admitted bringing armed "backup" to the park and arming himself with a "fully-loaded" MAC-10 to "punk" or "disrespect[]" a rival gang member.  He admitted that he "masked up," ordered John Jr. to leave an area Prum considered a "West Side Blood neighborhood," and fired his MAC-10 causing Aaron's death.

Prum's claim of undue prejudice lacks merit.

Prum argues the gang evidence constituted improper bad character evidence. "[G]ang evidence is inadmissible if introduced only to 'show a defendant's criminal disposition or bad character as a means of creating an inference the defendant committed the charged offense. [Citations.]' " (*People v. Avitia* (2005) 127 Cal.App.4th 185*, 192; Evid. Code, § 1101.)

As we have explained, the challenged evidence was probative of material issues in the case. We are not persuaded that such evidence was offered to show Prum's character or disposition. (*People v. Dominguez* (1981) 121 Cal.App.3d 481, 498, fn. 20 [evidence about gang membership and criminal purposes of the gang was relevant to prove motive for charged offense and did not constitute " 'criminal propensity' " character evidence prohibited by Evidence Code section 1101, subdivision (a)].)

We do not reach the same conclusion regarding Detective Gutierrez's testimony about the firearms police found during the February 11 search at 2845 Pixie Court A. Prum admitted he stayed at 2845 Pixie Court A sometimes. The residence belonged to Prum's aunt. Police found a red bandana and Prum's paycheck stubs in one bedroom and firearms in a different bedroom. There was no evidence that Prum stayed in the bedroom where the firearms were located or that Prum owned or possessed the firearms police found. Detective Gutierrez admitted he had no evidence linking the firearms to the February 8 shooting, but he said it was common for gang members to ask relatives to keep firearms for the gang member so that the gang member was not found to be in possession of the firearms. Prum testified the firearms belonged to his uncle.

There was no evidentiary link between the firearms, on the one hand, and Prum, a gang or the February 8 incident, on the other. Because evidence about the firearms bore no relevance to a material issue in the case, the evidence suggested that Prum was the kind of person who kept or had access to deadly weapons or had a criminal disposition.

(*People v. Avitia, supra,* 127 Cal.App.4th at pp. 193-194.)  Such evidence is inadmissible.  (*Ibid.*; *People v. Cardenas* (1982) 31 Cal.3d 897, 904-906.)

We evaluate error in the admission of evidence under the standard of *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*), i.e., we determine whether it was " 'reasonably probable that a result more favorable to defendant would have resulted' " had the challenged evidence not been admitted.  (*People v. Williams* (2009) 170 Cal.App.4th 587, 612-613; *People v. Avitia, supra,* 127 Cal.App.4th at p. 194.)  We conclude that the error in admitting the firearms evidence was harmless under *Watson* because even without that evidence, the prosecution overwhelmingly established Prum's guilt on the substantive offenses and the truth of the gang allegations.[10]

In addition, the trial court instructed the jury with CALCRIM No. 1403 regarding the limited use of the evidence.  Absent a contrary indication, we presume the jury

---

[10]  Prum also claims a violation of due process.  We must determine whether the erroneous admission of evidence rendered Prum's trial fundamentally unfair (*People v. Partida, supra*, 37 Cal.4th at p. 439), and if constitutional error occurred, whether it is clear beyond a reasonable doubt that the erroneously admitted evidence did not contribute to the verdict.  (*People v. Albarran, supra,* 149 Cal.App.4th at p. 229 [*Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705] standard applies to federal constitutional errors].)  Absent fundamental unfairness, error in admitting evidence is subject to the *Watson* test.  (*People v. Partida*, *supra,* 37 Cal.4th at p. 439.)

In light of Prum's testimony showing the ease and speed with which he obtained the semiautomatic firearm on February 8 and then disposed of the gun after firing it, and given Detective Gutierrez's admission that he did not know whether the guns seized from 2845 Pixie Court A belonged to Prum, we conclude the firearms evidence was not so prejudicial as to necessarily render Prum's trial unfair.  (*People v. Hunt* (2011) 196 Cal.App.4th 811, 817 [" 'Only if there are *no* permissible inferences the jury may draw from the evidence can its admission violate due process.  Even then, the evidence must "be of such quality as necessarily prevents a fair trial." [Citation.]' "].)  Moreover, given the substantial unchallenged evidence supporting Prum's conviction discussed in this part of our opinion, any error in the admission of the firearms evidence was harmless whether analyzed under *Watson* or *Chapman.*  Prum's ineffective assistance of counsel claim based on the firearms evidence fails.  (*People v. Maury* (2003) 30 Cal.4th 342, 394; *People v. Mattson* (1990) 50 Cal.3d 826, 876.)

understood and followed the trial court's instructions. (*People v. Yeoman* (2003) 31 Cal.4th 93, 139.) On this record, it is not reasonably probable that the jury would have returned verdicts more favorable to Prum had the firearms evidence been excluded.

5

Prum next asserts that certain evidence was cumulative. Specifically, he claims the 23 photographs identified as People's exhibit Nos. 118, 121-126, 153, 232-237 and 239-246, Detective Gutierrez's testimony about the photographs and a photograph from what appears to be a Bloods MySpace page were prejudicially cumulative.[11]

Exhibit Nos. 232 and 244, which relate to Garduno and Uy, did not duplicate the other photographs Prum challenges. Exhibit Nos. 122, 235, 242 and 243 relate to territory of the West Side Bloods and Original Bloods. Exhibit No. 238 shows images of persons "masked up" and throwing up gang signs in a Bloods MySpace page. Exhibit Nos. 242 and 246 show Prum with an individual who Detective Gutierrez testified he saw on a Bloods MySpace page. Exhibit No. 124 shows Prum's girlfriend Celines Petrosian with an unidentified male wearing a red bandana over his face and another person wearing red and throwing gang hand signs. The photographs are relevant to the gang charges, gang allegations and Petrosian's credibility. They are not unnecessarily duplicative nor excessive in number.

Prum also claims the testimony about 10 prior police contacts is prejudicially cumulative. We disagree.

As the court observed in *People v. Williams, supra,* 170 Cal.App.4th at page 611, there is no bright-line rule for determining when evidence is cumulative; such a

---

[11] Prum states the prosecution did not whittle down the photographs presented at trial. The record contradicts this claim as it shows that prior to trial, the prosecution's expert identified perhaps a dozen photographs, out of hundreds, which the expert felt were relevant to his testimony.

determination must be reasonable and practical. In that case, the appellate court concluded that it was cumulative to admit evidence of dozens of prior crimes and contacts with law enforcement. (*People v. Williams, supra,* at pp. 598-599, 610-611.) But the instant case is different. The number of police contacts was not excessive.

Except for the error in admitting evidence about firearms seized from 2845 Pixie Court A, which we conclude was harmless, we reject Prum's claims of error, violation of due process and ineffective assistance of counsel premised on challenged evidence. (*People v. Samaniego, supra,* 172 Cal.App.4th at p. 1170 [failure to make meritless objections cannot be the basis of an ineffective assistance of counsel claim].)

B

Prum next contends there was insufficient evidence to establish that one of the primary activities of the Bloods street gang is the commission of one or more of the criminal acts enumerated in section 186.22, subdivision (e). He claims it was insufficient for gang expert Detective Gutierrez to opine that some activities of the West Side Bloods included the commission of criminal acts listed in section 182.22, subdivision (e); instead, he asserts Detective Gutierrez had to specify the enumerated crimes in which the West Side Bloods primarily engage. Prum adds that although Detective Gutierrez testified about five predicate offenses, there was no evidence that those offenses were committed by current members or that the commission of those offenses was a primary activity of the Bloods. We reach a contrary conclusion.

To establish the existence of a "criminal street gang," the prosecution must prove that one of the gang's " 'chief,' " " 'principal' " or more than occasional occupations was the commission of one or more of the criminal acts listed in section 186.22, subdivision (e). (*Sengpadychith, supra,* 26 Cal.4th at p. 323; § 186.22, subds. (e), (f).) "Sufficient proof of the gang's primary activities might consist of evidence that the group's members consistently and repeatedly have committed criminal activity listed in [section 186.22, subdivision (e)]." (*Sengpadychith, supra,* 26 Cal.4th at p. 324, italics omitted.) Prior

41

conduct or acts committed at the time of the charged offenses can be used to establish the "primary activities" of the gang. (*Id.* at p. 323.) Expert testimony that the gang was primarily engaged in the enumerated criminal acts may also be sufficient. (*Id.* at p. 324.) For example, in *People v. Gardeley,* a gang expert opined that the primary activities of the gang in question were drug dealing and witness intimidation, both crimes listed in section 186.22, subdivision (e), based on conversations with the defendant and other gang members, information from other law enforcement officials, and investigation of hundreds of crimes committed by gang members. (*People v. Gardeley* (1996) 14 Cal.4th 605, 620.) Such testimony was sufficient to prove the primary activities of the gang. (*Sengpadychith, supra,* 26 Cal.4th at p. 324.)

Viewing the entire record in the light most favorable to the prosecution and drawing all permissible inferences in favor of the judgment, as we must in determining Prum's insufficiency of evidence claim (*Ochoa, supra,* 6 Cal.4th at p. 1206), we conclude that substantial evidence supports the jury's finding that a primary activity of the West Side Bloods and the Original Bloods was the commission of crimes enumerated in section 186.22, subdivision (e). The prosecution presented Detective Gutierrez as an expert on Asian criminal street gangs in Stockton, without objection from Prum. As part of his duties as a member of the Stockton Police Department's gang violence suppression unit, Detective Gutierrez investigated gang-related crimes, validated gang members, and gathered intelligence regarding gangs and their members. His knowledge about the Bloods was based on his participation in the arrests of Bloods members, his conversations with Bloods members, police reports concerning Bloods, and his investigation of crimes by Bloods members. His opinion about the activities of Bloods members was based on his training and experience, including listening to wiretaps of conversations between gang members.

According to Detective Gutierrez, the Original Bloods and West Side Bloods had become one gang and their members committed crimes together. He testified that some

of the activities of the West Side Bloods included the commission of crimes listed in section 186.22, subdivision (e), and that the Original Bloods committed the following crimes listed under section 186.22, subdivision (e): robbery, auto theft, carjacking, sale of narcotics, and shooting at residences, vehicles and persons. Detective Gutierrez gave four examples of enumerated offenses committed by members of the West Side Bloods and Original Bloods: (1) on January 31, 2007, Calvin Claridy, a documented West Side Bloods member, committed auto theft (Veh. Code, § 10851, subd. (a)); (2) in April 2007, documented West Side Bloods member Antwaine Williams pleaded guilty to possession of a controlled substance for sale (Health & Safety Code, § 11378) and possession of a firearm by a felon (former § 12021, subd. (a)); (3) in September 2007, documented Original Bloods member Tony Sann committed the crime of possession of cocaine base for sale (Health & Safety Code, § 11351.5); and (4) in August 2007, Prum was convicted of carrying a concealed firearm by a gang member (former § 12025, subd. (b)(3)). The prosecution presented certified court documents and a certified rap sheet in support of Detective Gutierrez's testimony. Auto theft, possession for sale of controlled substances, possession of a firearm in violation of former section 12021 and carrying a concealed firearm in violation of former section 12025 are crimes enumerated in section 186.22, subdivision (e). (§ 186.22, subd. (e)(4), (25), (31), (32).) Detective Gutierrez also stated that Claridy, Williams, Sann and Prum were not the only Bloods who had committed enumerated crimes.

Detective Gutierrez further testified about the more than occasional criminal activity by Bloods. According to the detective, "gangsters are out there, they're armed, they are getting stopped by the police, getting arrested for narcotics, firearms violations . . . . They're out making money, they're out terrorizing people, they're carjacking people. That's what this gang does." Detective Gutierrez's testimony that Bloods engaged in firearms violations is corroborated by Prum's 2007 conviction for carrying a concealed firearm, Antwaine Williams's 2007 conviction for possession of a firearm by a

43

felon, and Prum's testimony that he, Uy and Cole, all admitted Bloods, were armed during the Louis Park incident. Detective Gutierrez opined that the West Side Bloods and Original Bloods were "active" criminal street gangs in Stockton, engaging in incidents such as shootings, car theft and drug sales, and increasing membership.

There was substantial evidence upon which the jury could reasonably infer that a principal activity of the Original Bloods and West Side Bloods was committing the enumerated crimes of auto theft, sale of controlled substances, and unlawful possession of firearms. (*People v. Villegas* (2001) 92 Cal.App.4th 1217, 1227-1228.)

C

Prum also claims the trial court erred in instructing the jury with CALCRIM No. 372 [defendant's flight] because there was no evidence supporting an inference of consciousness of guilt. In Prum's view, merely leaving the scene of a crime does not show consciousness of guilt.

The Attorney General responds that the flight instruction was appropriate because Prum admitted he left the Louis Park area after the shooting because he knew the police would be in that neighborhood. The record supports the Attorney General's position.

" 'In general, a flight instruction "is proper where the evidence shows that the defendant departed the crime scene under circumstances suggesting that his movement was motivated by a consciousness of guilt." ' [Citations.]" (*People v. Bonilla* (2007) 41 Cal.4th 313, 328; *People v. Howard* (2008) 42 Cal.4th 1000, 1020-1021.) Flight does not require the physical act of running or the reaching of a faraway haven. (*People v. Wallace* (2008) 44 Cal.4th 1032, 1074.) It only requires " ' "a purpose to avoid being observed or arrested." ' " (*Ibid*.)

Prum ran from the park after firing his weapon. He drove to a friend's house to hide. After about an hour or so, he left for Jackson Rancheria Casino because he "wanted to get away" and he knew the police would be around. He gave his gun to someone with instructions to get rid of it, and the day after the shooting Prum cut his hair. Although

44

Prum's girlfriend told him the police wanted to talk to him about what happened at the park, Prum did not respond to the police. The jury could reasonably infer from this evidence that Prum left the Louis Park area to avoid detection by the police. Under those circumstances, the instruction on flight was proper.

D

Prum further contends the jury instruction given for attempted murder (former CALCRIM No. 600) did not accurately explain the kill zone theory. He contends the instruction did not require a finding of intent to kill and allowed the jury to convict him of attempted murder based solely on a finding of implied malice, i.e., that he recklessly fired his gun toward a group of cars and created the possibility that the occupants of Renee's car would be harmed.

In determining the correctness of jury instructions, we consider the instructions as a whole. (*People v. Fiu, supra,* 165 Cal.App.4th at p. 370.) We ask whether there is a reasonable likelihood the jury misconstrued or misapplied the law in light of the instructions given, the entire record of trial and the arguments of counsel. (*Ibid.*)

Here, the entire instruction given by the trial court adequately informed the jury of the requisite intent and the kill zone theory as articulated in *Bland, supra*, 28 Cal.4th 313.

Unlike murder, proof of express malice is required to establish attempted murder. (*Smith, supra,* 37 Cal.4th at p. 739.) Implied malice or conscious disregard for human life will not suffice. (*Ibid.*; *Bland, supra,* 28 Cal.4th at pp. 327–328.) The prosecution must show that the defendant intended to kill the alleged victim, not someone else. (*Bland, supra,* at p. 328.)

The kill zone theory recognizes that the defendant may intend to kill a primary target and concurrently intend to kill others within the kill zone. (*Bland, supra,* 28 Cal.4th at pp. 329-331.) The theory does not relieve the prosecution from showing specific intent, but the jury may reasonably infer that the defendant intended to kill the victims within the kill zone if the defendant, with the intent to kill the primary target,

45

employed a means of attack designed to kill everyone in the vicinity of the primary target in order to ensure that target's death. (*Ibid.*)

Here, the trial court instructed the jury that attempted murder required a specific mental intent. It further instructed: "To prove that the defendant is guilty of attempted murder, the People must prove that: [¶] One, the defendant took at least one direct but ineffective step toward killing another person; [¶] And, two, the defendant intended to kill that person." It also admonished the jury that "[a] person may intend to kill a specific victim or victims and at the same time intend to kill anyone in a particular zone of harm or 'kill zone.' [¶] In order to convict the defendant of the attempted murder of Renee[], Alana[], [and] Marissa[], the People must prove that the defendant not only intended to kill John Tellez Jr., but also either intended to kill Renee[], Alana[], Marissa[], or intended to kill anyone within the kill zone. [¶] If you have a reasonable doubt whether the defendant intended to kill Renee[], Alana[], Marissa[], or intended to kill John Tellez Jr. by harming everyone in the kill zone, then you must find the defendant not guilty of the attempted murder of Renee[], Marissa[], [and Alana]."

Prum criticizes the trial court's use of the words "anyone," "zone of harm" and "harming" in its instruction for attempted murder.[12] He claims those words removed the intent to kill element of attempted murder.

Regarding the word "anyone," the court in *Bland* said a defendant may be convicted of attempted murder of "any" within the kill zone based on a concurrent intent theory. (*Bland*, *supra,* 28 Cal.4th at p. 331.) And in addressing substantially similar language in a kill zone jury instruction, the California Supreme Court said in *People v. Stone* (2009) 46 Cal.4th 131, 138, footnote 3, that read in context, "a jury hearing about

---

[12] In August 2009, CALCRIM No. 600 was amended to replace the words "anyone" and "harming" with "everyone" and "killing." The trial court did not instruct with the amended CALCRIM No. 600.

the intent to kill *anyone* within the kill zone would probably interpret it as meaning the intent to kill *any* person who happens to be in the kill zone, i.e., *everyone* in the kill zone." (*Stone, supra,* 46 Cal.4th at p. 138, fn. 3.) Additionally, the appellate court in *People v. Campos* (2007) 156 Cal.App.4th 1228, 1241-1243 (*Campos*) rejected the same claim Prum raises on appeal based on the same former CALCRIM No. 600 language at issue here. The court in *Campos* said the terms " 'kill anyone within the kill zone' " and " 'kill everyone within the kill zone' " both require a finding of specific intent to kill each person within the group. (*Campos, supra,* 156 Cal.App.4th at p. 1243.)

As for the trial court's use of the words "zone of harm" and "harming," the challenged instruction clearly required the jury to find that Prum intended to "kill," not just "harm." (*People v. Bragg* (2008) 161 Cal.App.4th 1385, 1395-1396 [rejecting challenge to use of words " 'harm' " and " 'zone of harm' " in kill zone instruction]; *Bland, supra,* 28 Cal.4th at p. 330 [citing term " 'zone of harm' " with approval].) No reasonable juror would have construed these terms as permitting a conviction for attempted murder premised on intent to harm rather than intent to kill. (*People v. Bragg, supra,* at pp. 1395-1396.)

Prum claims the trial court failed to explain that under the kill zone theory, Prum must have used a mode of attack designed to kill everyone inside Renee's car for the jury to reasonably infer that Prum intended to kill the persons in that car. But the court in *Bland* stated that the kill zone theory is not a legal doctrine requiring special jury instruction. (*Bland, supra,* 28 Cal.4th at p. 331, fn. 6.) "[I]t is simply a reasonable inference the jury may draw in a given case." (*Ibid.*) In light of all the instructions and all the evidence, we are not persuaded the jury could have misapplied the attempted murder instruction in these circumstances. Prum relies on cases where one or two gunshots were fired toward a group of people, but that is not this case. *People v. Anzalone* (2006) 141 Cal.App.4th 380, *People v. Leon* (2010) 181 Cal.App.4th 452 and *People v. Perez* (2010) 50 Cal.4th 222 are distinguishable because here, Prum used a

fully loaded semiautomatic weapon, and he and his cohorts fired over a dozen shots at the fleeing victims. On this record, the jury could not misconstrue the instruction.[13]

E

In addition, Prum claims there was insufficient evidence that he attempted to kill Renee and her daughters. He asserts there was no evidence to show where all of his bullets landed, no evidence that he saw or knew Renee and her daughters were in that particular car, and no evidence that he attempted to kill John Jr. by killing everyone in Renee's car. Applying the principles articulated previously in this opinion governing a review for sufficiency of the evidence to support a conviction, we reach a contrary conclusion. Based on the evidence of Prum's retaliatory animus, the actions he took to prepare for a confrontation with John Jr., the words Prum spoke during the confrontation, the lethal capability of the weapon he used, the number of shots fired, his admission that he shot at a sportscar, the likeness and proximity of the victims' car to the car in which John Jr. was a passenger, and the vulnerable position of Renee's car when Prum fired upon it, the jury could reasonably have found beyond a reasonable doubt that Prum intended to kill John. Jr., fired at everyone in the area around John Jr. to ensure John Jr.'s death, and that Renee and her daughters were within the kill zone Prum intentionally created. The fact that Prum did not know Renee and her daughters were in a car that was within the kill zone does not negate Prum's intent to kill all those in the area toward which he repeatedly fired. (*People v. Vang* (2001) 87 Cal.App.4th 554, 564-565 [fact

---

[13] Prum adds that the prosecutor committed misconduct by arguing that Prum and his codefendants jointly intended to create a kill zone even though there was no evidence that Prum asked or encouraged his codefendants to shoot or that all of them shared the intent to kill. He claims the prosecutor improperly asked the jury to apply an aiding and abetting theory. But because this contention was not asserted in a separate heading, we need not address it. (Cal. Rules of Court, rule 8.204(a)(1)(B); *People v. Harper* (2000) 82 Cal.App.4th 1413, 1419, fn. 4; *Opdyk v. California Horse Racing Bd*. (1995) 34 Cal.App.4th 1826, 1830-1831, fn. 4.)

that defendants could not see all of the victims inside the dwelling subjected to gunfire and fact that defendant mistakenly believed the target was inside the dwelling do not negate their express malice]; *People v. Adams, supra,* 169 Cal.App.4th at p. 1023 [whether defendant was aware that the attempted murder victims were within the zone of harm is not a defense].)  Substantial evidence supports the convictions for attempted murder.

F

Prum asserts the trial court erred in failing to instruct the jury on the elements for carrying a loaded firearm by a gang participant (former § 12031, subd. (a)(2)(C), now § 25850, subd. (c)(3) -- count 6) and carrying a concealed firearm by a gang participant (former § 12025, subd. (b)(3), now § 25400, subd. (c)(3) -- count 7).  He contends the error is reversible per se.  In the alternative, Prum argues reversal is required because the Attorney General cannot demonstrate that the trial court's instructional error was harmless beyond a reasonable doubt.

The Attorney General agrees that the trial court "mistakenly omitted the jury instructions" relevant to counts 6 and 7, but asserts the error was harmless.

It is well established that "[t]he trial court must instruct even without request on the general principles of law relevant to and governing the case. [Citation.]  That obligation includes instructions on all of the elements of a charged offense. [Citation.]" (*Cummings, supra,* 4 Cal.4th at p. 1311.)  In *Cummings*, one of the defendants was charged and convicted of attempted robbery, robbery and conspiracy to commit robbery. (*Id.* at pp. 1255-1256.)  The trial court did not instruct the jury on four of the five elements of robbery, telling the jury only that " ' . . . the crime of attempted robbery . . . requires the specific intent to permanently deprive the owner of its property.' " (*Id.* at pp. 1311-1312, fn. omitted.)  The California Supreme Court held that the trial court's instructional error was reversible regardless of the overwhelming evidence of the defendant's guilt. (*Id.* at p. 1315.)  Reviewing California and federal cases, the Supreme

49

Court distinguished cases where the trial court omitted instructions on the elements of a special circumstance, where the jury necessarily found the element on which it was incorrectly instructed, and where the instructions withdrew part of an element from the jury's consideration.  (*Cummings, supra,* 4 Cal.4th at pp. 1312-1314.)  The Supreme Court stated:  "These decisions make a clear distinction between instructional error that entirely precludes jury consideration of an element of an offense and that which affects only an aspect of an element.  Moreover, none suggests that a harmless error analysis may be applied to instructional error which withdraws from jury consideration substantially all of the elements of an offense and did not require by other instructions that the jury find the existence of the facts necessary to a conclusion that the omitted element had been proved."  (*Id.* at p. 1315.)  The Supreme Court also noted that the record contained little that might have offset the trial court's omission.  The other instructions did not require the jury to find the existence of the omitted elements.  (*Ibid.*)  The information was not read to the jury and the prosecutor's closing statement did not list the elements of robbery.  (*Cummings, supra,* 4 Cal.4th at p. 1312, fn. 52.)  And a finding in favor of the prosecution on the element for which there was proper instruction did not compel a conclusion that the jury found the facts necessary to establish the remaining elements.  (*Id.* at p. 1314.)

*People v. Kobrin* (1995) 11 Cal.4th 416 is also instructive.  In that case the defendant was charged with perjury based on an affidavit he submitted in support of a petition for a restraining order.  (*Id.* at p. 421.)  Although materiality is an element of the crime of perjury, the trial court did not submit that element to the jury.  (*Id.* at pp. 419, 421.)  Instead, the trial court determined the question of materiality and told the jury that certain statements made by the defendant were material.  (*Id.* at p. 421.)  The Supreme Court held the jury was required to decide the element of materiality.  (*Id.* at p. 427.)  And harmless error analysis was inapplicable because "the jury's findings on materiality . . . were nonexistent due to the instructional omission.  Thus, '[t]here is no *object*, so to

speak, upon which harmless-error scrutiny can operate.' [Citation.]" (*Id.* at pp. 423, 427, 429.) "Given the complete failure to instruct on materiality, i.e., to have the jury assess the evidence in relation to *that* element of the offense, a finding of harmless error would rest solely on conjecture, effectively substituting this court for the jury as the trier of fact." (*Ibid.*) Additionally, harmless error analysis would require the reviewing court to speculate because the trial court did not allow the defendant to submit evidence relevant to materiality. (*Kobrin, supra,* 11 Cal.4th at p. 430.)

The instructional error in this case is like the one in *Cummings* because the jury received no instruction on the findings necessary to convict Prum on counts 6 and 7.

The trial court instructed the jury that to convict Prum on counts 6 and 7 it had to find that Prum intentionally committed the prohibited acts, and the prohibited acts would be explained in the instructions for the particular crimes. But the trial court did not instruct with CALCRIM No. 2520 [carrying a concealed firearm] or CALCRIM No. 2530 [carrying a loaded firearm], did not give any other specific instructions for the particular crimes charged in counts 6 and 7, and hence did not instruct the jury on the elements for those crimes. The omission was reversible error. (*Cummings, supra,* 4 Cal.4th at p. 1315.) Although the Attorney General urges us to apply harmless error analysis based on the overwhelming evidence that Prum carried a loaded and concealed weapon, harmless error analysis does not apply where, as here, the trial court did not give any instruction on the elements of the charged offenses. (*Ibid.*) We will not speculate in these circumstances whether it appears beyond a reasonable doubt that the instructional error did not contribute to the jury's verdict on counts 6 and 7. (*People v. Kobrin, supra,* 11 Cal.4th at pp. 423, 427, 429.) Where there was a total failure to instruct on the elements of a charged offense and the jury was not required to make factual findings necessary to prove all of the omitted elements, *Cummings, supra,* 4 Cal.4th 1233 dictates a reversal. Accordingly, we need not address Prum's assertion that his conviction on count 9 must be reversed if the convictions on counts 6 and 7 are allowed to stand.

51

## G

Prum also contends the trial court committed various sentencing errors.

### 1

Prum argues the trial court violated section 664 when it sentenced him to 15 years to life in prison on the attempted murder convictions. He argues the sentence was not authorized because under section 664, the sentence for premeditated attempted murder is life in prison.

The jury convicted Prum for attempted premeditated murder on counts 2, 3 and 4. The jury also found true the allegation that the attempted murders were committed to benefit a criminal street gang. Attempted premeditated murder is punishable by life in prison with the possibility of parole. (§ 664, subd. (a).) Where the defendant is convicted of a felony committed to benefit a criminal street gang and the felony is punishable by life in prison, section 186.22, subdivision (b)(5) requires the defendant to serve a minimum of 15 years in prison. Prum's sentence of life with a 15-year minimum parole eligibility period was consistent with the section 664, subdivision (a) requirement of life with the possibility of parole, and the trial court did not violate section 664.

### 2

Prum next claims the trial court incorrectly imposed additional life sentences as enhancements under section 186.22, subdivision (b) on the convictions for first degree murder (count 1), attempted premeditated murder (counts 2, 3, 4), and shooting at an occupied motor vehicle (count 5).

As we explained in our discussion of Uy's contentions, section 186.22, subdivision (b)(1) does not apply to the count 1 LWOP sentence. In addition, section 186.22, subdivision (b)(1) does not apply to the convictions for attempted premeditated murder (counts 2, 3 and 4), because those are felonies punishable by life in prison (§§ 190.2, subd. (a)(22), 664, subd. (a)) and are subject to section 186.22, subdivision (b)(5). (*Lopez, supra,* 34 Cal.4th at p. 1004.) Under the circumstances, the trial court

should not have imposed a second life sentence as an enhancement on the convictions for counts 1, 2 and 3, and it should not have imposed a 10-year prison term as an enhancement on the conviction for count 4. We will modify the judgment by striking those enhancements.

Regarding count 5, Prum contends the trial court should have imposed a life sentence with a minimum parole term of 15 years instead of a determinate term of five years plus a life term for the gang allegation. He is correct.

The jury convicted Prum of willfully and maliciously shooting at an occupied vehicle (§ 246) and found true the gang benefit allegation (§ 186.22, subd. (b)). A violation of section 246 is punishable by imprisonment for three, five or seven years. (§ 246.) But when, as here, section 246 is violated to benefit a criminal street gang, the crime is punishable by an indeterminate term of life in prison with a minimum term of 15 years. (*People v. Jones* (2009) 47 Cal.4th 566, 572; § 186.22, subd. (b)(4)(B).) Section 186.22, subdivision (b)(4) is a penalty provision, not a sentence enhancement. (*Jones, supra,* 47 Cal.4th at p. 576.) It " 'sets forth an *alternate* penalty for the underlying felony itself, when the jury has determined that the defendant has satisfied the conditions specified in the statute.' [Citation.]" (*Ibid.,* emphasis added.)

We will modify the judgment to reflect that Prum is sentenced on the count 5 conviction to a term of 15 years to life in prison.

Because we will reverse the convictions on counts 6 and 7, we do not address Prum's claim asserting section 654 sentencing error.

DISPOSITION

As to Uy, on the count 1 conviction of murder, we reverse the LWOP sentence and strike the 10-year gang enhancement imposed pursuant to section 186.22, subdivision (b)(1). We remand the matter for resentencing consistent with *Gutierrez, supra,* 58 Cal.4th 1354, and *Miller, supra,* 567 U.S. ___ [183 L.Ed.2d 407]. The judgment is otherwise affirmed as modified. After resentencing, the trial court is directed

53

to amend the abstract of judgment and to forward a certified copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation.

As to Prum, the convictions on counts 6 and 7 are reversed; the sentences on those counts are vacated. In addition, the judgment is modified to strike the life sentences imposed pursuant to section 186.22, subdivision (b)(1) on the convictions for counts 1, 2 and 3, and the 10-year prison term enhancement on the conviction for count 4. The judgment is further modified to reflect that Prum is sentenced on the count 5 conviction to a term of 15 years to life in prison. The judgment is affirmed as modified. The trial court is directed to amend the abstract of judgment to reflect the judgment as modified and to forward a certified copy of the amended abstract of judgment to the Department of Corrections and Rehabilitation.


                                                                                                     MAURO                  , J.


We concur:


                  RAYE                  , P. J.


                  NICHOLSON          , J.